UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: SEP 2 8 2017

The City of New York, *et al.,*

          Plaintiffs,

    –v–

Liberty Mutual Insurance Company,

          Defendant.

15 Civ. 8220 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

On September 17, 2015, the City of New York (the "City") and the Board of Education of the City School District of the City of New York (the "DOE") (the "Plaintiffs") filed an action in New York State Supreme Court against the Defendant, Liberty Mutual Insurance Company ("Liberty"), seeking declarations that Liberty must defend the Plaintiffs in five underlying actions, as well as seeking reimbursement for the costs associated with the Plaintiffs' defense in those actions thus far. *See* Dkt. No. 1, Ex. 1 ("Compl."). On October 19, 2015, Liberty removed this case to federal court based on diversity jurisdiction. Dkt. No. 1.

Now before the Court are the Plaintiffs' motion for partial summary judgment as to six of the causes of action in this case (relating to three of the underlying actions) and the Defendants' cross-motion for summary judgment as to those same causes of action.[1] *See* Dkt. No. 29 (Plaintiffs' notice of motion); Dkt. No. 34 (Defendant's notice of motion). For the reasons that

---

[1] Plaintiffs do not seek summary judgment as to the remaining four causes of action pertaining to two other underlying suits.

follow, the Court GRANTS the Plaintiffs' motion in its entirety and DENIES the Defendant's cross-motion.

## I. Background[2]

### A. The Insurance Policy

The New York City School Construction Authority (the "Authority") is a public benefit corporation organized under the laws of New York State, charged with overseeing the design, construction, reconstruction, rehabilitation, improvement, furnishing, equipping, and repair of public schools in New York City. Pl. 56.1 ¶1; Def. Resp. 56.1 ¶ 1.

Prior to 2011, the Authority obtained a commercial general liability policy (the "Policy") from the Defendant, Liberty. Pl. 56.1 ¶ 2; Def. Resp. 56.1 ¶ 2. The Authority is a named insured under the Policy. Pl. 56.1 ¶ 3; Def. Resp. 56.1 ¶ 3. The Policy provides for a limit of $5,000,000 per occurrence, subject to a $2,000,000 deductible. Def. 56.1 ¶ 1; Pl. Resp. 56.1 ¶ 1. Of significance to the present action, the Policy includes both a right of indemnification and a right of defense as follows:

> We [Liberty] will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages even if the allegations of the "suit" are groundless, false, or fraudulent. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.[3]

Pl. 56.1 ¶ 4; Def. Resp. 56.1 ¶ 4; Dkt. No. 32-5 at 69 (hereafter the "Policy").

---

[2] Unless otherwise noted, these facts are undisputed.

[3] The Policy states that the insurance applies only to "'bodily injury' and 'property damage'" if, among other requirements, the injury or damage "is caused by an 'occurrence' that takes place in the 'coverage territory'" and the injury or damage "occurs during the policy period." Policy at 102.

Section II of the policy includes a section denominated "who is an insured." Policy at 110. By virtue of an endorsement to the Policy, Section II includes as additional insureds the Plaintiffs in this case, the City and the DOE. Policy at 93; Pl. Rule 56.1 ¶ 8; Def. Resp. 56.1 ¶ 8. That endorsement states as follows:

> Section II – Who is an insured is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury," "property damage," or "personal and advertising injury" *caused, in whole or in part, by your acts or omissions* or the acts or omissions of those acting on your behalf:
>
> A. *In the performance of your ongoing operations*; or
> B. In connection with premises owned by or rented to you.

Pl. 56.1 ¶ 9; Def. Resp. 56.1 ¶ 9; Policy at 93 (emphases added).

## B. The Three Underlying Actions

As noted, this case stems from the Defendant's refusal to defend the Plaintiffs, as additional insureds under the Policy, against three underlying actions: the "James" action, the "Mertz" action, and the "Guarnaccia" action. As the parties debate the precise contours of the allegations in these complaints, as well as the meaning and import of evidence extrinsic to the complaints, the Court describes both in detail.

### 1. The "James" Action

On April 30, 2014, Patricia James filed a verified complaint in New York State Supreme Court, naming the Authority, the City, and the DOE as Defendants. *See Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 (N.Y. Sup. Ct. Apr. 30, 2014) (Dkt. No. 32-6) (hereafter "James Complaint").

In her Complaint, James alleges that on February 14, 2013, she was injured when she tripped, slipped, or fell on the sidewalk abutting Public School 111, located at 3740 Baychester Avenue, Bronx, New York ("P.S. 111"). Pl. 56.1 ¶ 10; Def. Resp. ¶ 1. She also alleges, *inter alia*, that on February 14, 2013 (the date of her accident), the Authority "own[ed]," "was a lessee of," "was a general contractor at," "operated," "maintained," "managed," "controlled," and "supervised," "the premises known as P.S. 111 …. [i]nclusive of the abutting sidewalk (hereinafter referred to as the 'Aforesaid Premises.')." James Complaint ¶¶ 25 – 33. She further alleges that "[o]n or before February 14, 2013," the Authority "repaired," "inspected," "constructed," and "designed" said premises, and that, again on February 14, 2013, "the [Authority had a] duty … to maintain the Aforesaid Premises in a reasonably safe and suitable condition and in good repair." *Id.* ¶¶ 34-38. Turning to the substance of her injury, James alleges that she "was caused to trip, slip, and/or fall on the Aforesaid Premises due to a defective sidewalk." *Id.* ¶ 68. She alleges that "[t]he aforesaid occurrence and resulting injuries to [her] were caused solely by the negligence, carelessness and recklessness of the defendants, in the ownership, leasing, operation, maintenance, management, control, supervision, construction, demolition[,] alteration, repair and/or inspection of the Aforesaid Premises." *Id.* ¶ 70.

In support of its motion for summary judgment, Liberty also cites to evidence extrinsic to the James Complaint that it claims is relevant to these motions. It is undisputed that, notwithstanding the Complaint's allegations, the Authority neither owned nor leased P.S. 111 on February 14, 2013. Def. 56.1 ¶ 7; Pl. Resp. 56.1 ¶ 7. It is further undisputed that, at the time of the accident, no written contract existed between the Authority, on the one hand, and the City or DOE, on the other, obligating the Authority to maintain, operate, repair, manage, or control P.S. 111 or the abutting sidewalk, and that the Plaintiffs are unaware of any oral contract imposing

4

such an obligation. Def. 56.1 ¶ 8; Pl. Resp. 56.1 ¶ 8. Additionally, a search of Department of Transportation records from February 14, 2011, through February 14, 2013 turned up no permits issued to the Authority to perform any construction or repair work on the sidewalk, and turned up no contract with the Authority to do the same. Def. 56.1 ¶ 13; Def. Ex. H. Shephard Jaffess, a senior project officer for the Authority, also submitted an affidavit as part of the James action in support of the Authority's motion to dismiss that action. Def. Ex. F. In that affidavit, he represents that, at the time of the James accident, the Authority "was not involved in any ongoing projects at the school, and likewise, did not retain a general contractor or construction manager to oversee construction and/or renovation at or near the premises of P.S. 111." *Id.* ¶ 6.

Additionally, the Defendant provided excerpts of a deposition of James taken at a municipal hearing conducted just prior to when she filed her complaint, where she was examined by the Corporation Counsel of New York. *See* Def. Ex. G; *see also* N.Y. Gen. Mun. Law § 50-h(1)("Wherever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made."). [4] James testified at that proceeding that she fell when her "right foot got caught in the uneven sidewalk." Ex. G. at 31. She further testified that, on the date of her accident, she did not notice "anyone doing any construction work in the vicinity." *Id.* at 33.

---

[4] The Plaintiffs argue that Defendants may not rely on testimony from the § 50-h proceedings in support of their motion for summary judgment, as such testimony is hearsay. *See* Pl. Reply at 9. The court need not resolve this objection, as the Court concludes, *infra*, that the evidence does not, in any case, defeat the duty to defend.

## 2. The "Mertz" Action

On April 21, 2014, Kathleen Mertz filed an action in New York State Supreme Court, naming the Authority, the City, and the DOE as Defendants. *Kathleen Mertz v. The City of New York, the New York City Department of Education, and New York City School Construction Authority*, Index No. 006209/2014 (N.Y. Sup. Ct. Apr. 21, 2014) (Dkt. No. 32-7) (hereafter "Mertz Complaint"). [5]

Mertz alleges, in her Complaint, that on May 8, 2013, she was injured when she fell while descending an exterior stairway (the "Transportable") at a public school known as A.C.E. Academy at P256, located at 160 Beach 29th Street, Queens, New York ("A.C.E. Academy"). Pl. 56.1 ¶ 17; Def. Resp. ¶ 17. She further alleges that the Authority was "the owner of the Transportable," that it "operated the ... Transportable," that the Transportable was under the Authority's "control," and that the Authority, "its agents, servants, and/or employees, maintained" and "supervised the ... Transportable." Mertz Complaint at 4-6. The Complaint also alleges that it was the duty of the Authority "to have and keep the ... Transportable in a safe and proper manner," that "prior to May 8, 2013, [the Authority] performed certain work on the transportable at the aforesaid school premises," and that the Authority "designed," "installed," and "repaired" the Transportable. *Id.* at 6-7. As to her fall, specifically, Mertz alleges that she slipped and/or fell while descending the Transportable's steps "as a result of the defective, irregular, deteriorated, warped, unpainted, rotting, moss/mold covered, slimy, wet, slippery, dangerous, hazardous and unsafe condition of the ... stairway," and that such slip and/or fall resulted, *inter alia*, from "the negligence, carelessness and recklessness of the defendants ... in

---

[5] The numbering for the allegations in the Mertz Complaint is inconsistent, with numbers appearing out of order and frequently repeated. The Court thus cites to the page numbers, and not the paragraph numbers, of that complaint.

the ownership, operation, management, maintenance, supervision and control of the aforesaid school and/or the work performed at the school and/or transportable stairway and/or steps at the aforesaid location." *Id.* at 7-8.

As with the James action, the Defendant points to additional evidence extrinsic to the Mertz Complaint as relevant to this action. First, it is undisputed that on May 8, 2013, the date of Mertz's accident, the Authority did not own or lease P.S. 43 or the Transportable. Def. 56.1 ¶ 18; Pl. Resp. 56.1 ¶ 18. It is further undisputed that no written contract between the Authority and the City or DOE obligated the Authority to maintain, operate, repair, manage, or control P.S. 43 or the Transportable at the time of the accident. Def. 56.1 ¶¶ 19-20; Pl. Reply 56.1 ¶¶ 19-20. In an affidavit submitted as part of the underlying action, again in support of the Authority's motion to dismiss that action, Gordon Tung, a senior director at the Authority, averred that the Authority was "not involved in any construction and/or renovation projects at A.C.E. Academy" at the time of the accident. Def. Ex. K ¶ 6.

The Defendant also provided testimony Mertz gave at a municipal hearing prior to filing her complaint. Mertz testified that she believed that the Authority had set up the Transportable, which had been there for approximately 15 years. Def. Ex. J. at 11. She further testified that she slipped on a particular step, which was covered in moss, that she had been told that others had been injured on the stairs, and that she was uncertain whether the steps had been "repaired at all prior to [her] accident." *Id.* at 17-22. Finally, Mertz testified that there was no "construction or work being done in the area of the accident on the day of the accident." *Id.* at 49.

### 3.    The "Guarnaccia" Action

On June 21, 2014, Mary Anne Guarnaccia filed an action in New York State Supreme Court, naming the Authority, the City, and the DOE as Defendants. *Mary Anne V. Guarnaccia v.*

*The City of New York, the New York City School Construction Authority, and the New York City Department of Education*, Index No. 505355/2014 (N.Y. Sup. Ct. June 21, 2014) (Dkt. No. 32-8) (hereafter "Guarnaccia Complaint").

Guarnaccia alleges, in her Complaint, that on September 17, 2013, she was injured while walking on the sidewalk in front of Intermediate School 234, located at 1875 East 17th Street, Brooklyn, New York ("I.S. 234"). Pl. 56.1 ¶ 26; Def. Resp. 56.1 ¶ 26. She alleges, *inter alia*, that the Authority was "the owner of the premises denominated as I.S. 234," and that the Authority "maintained," "controlled," "operated," "was the lessor of," and "was the lessee of" of these premises. Guarnaccia Complaint ¶¶ 28-33. More specifically, she alleges that the Authority owned "the sidewalk" where she fell, and that it "maintained," "controlled," "operated," "was the lessor of," and "was the lessee of" the "accident location." *Id.* ¶¶ 34-39. She alleges that her accident was a result of the negligence of the Authority in "the maintenance, control, operation and supervision of the premises, sidewalk and subject accident location." *Id.* ¶ 40. She also alleges that the Authority "caus[ed], permit[ted], and allow[ed] a hazardous and trap like and tripping condition to develop at the [accident] location (including but not limited to allowing defective and dangerous conditions such as uprooted tree roots to extend out into its sidewalk and to cause and create the cement sidewalk to be and become cracked, uneven and trap like"). *Id.* ¶ 41.

As with the James and Mertz actions, the Defendant cites to additional extrinsic evidence. First, it is undisputed that the Authority did not own or lease I.S. 234 at the time of Guarnaccia's accident. Def. 56.1 ¶ 30; Pl. Resp. ¶ 30. Further, no written contract obligated the Authority to maintain, operate, repair, manage, or control I.S. 234 or the abutting sidewalk where the accident occurred. Def. 56.1 ¶ 31; Pl. Resp. ¶ 31. On the other hand, it is not subject to reasonable

dispute that the Authority was under contract to perform construction work on the roof of I.S. 234, as well as to the facades, windows, and parapets of the building. Def. 56.1 ¶ 33; Pl. Resp. 56.1 ¶ 33; Def. Ex. O (bid and contract agreement).

At a municipal hearing prior to the filing of her complaint, Guarnaccia testified that the area of the sidewalk where she tripped was close to scaffolding erected as a result of this construction work. *See* Def. Ex. N at 19 (in which, when asked "[w]here in relation to your accident location was the scaffolding," Guarnaccia testified "[i]t's to the left and to the right. It's to the fence, left, and to the right to the curb."). Guarnaccia further testified that there was a tree at the accident location, and that she had walked past it "[m]any times." *Id.* at 22. The tree was also flanked by scaffolding. *See id.* Asked whether she knew if "any particular construction workers had been working at that location or construction companies," Guarnaccia replied that "[t]hey've been working there for four years." *Id.* As to her accident more specifically, Guarnaccia testified that she "tripped on a crack," *id.* at 23, which was "jutting out of a box" containing the tree, Ex. Q at 20. She testified that there was no "construction material in the vicinity of where [she] tripped," but also noted that the scaffolding at that location was "three or four feet away." EX. N at 30-31. Asked whether the "roofing work that was being performed on the school at the time of [her] accident" had "any bearing on [her] accident," Guarnaccia responded "[n]ot that [she] kn[e]w of." Ex. Q at 66. Instead, she testified that she believed Hurricane "Sandy blew the trees around," "uplifted the roots," and caused the crack. Ex. R at 69. Asked why she had sued the Authority, Guarnaccia testified "[i]t was because of the scaffolding." *Id.* at 76. She also testified, however, that she had no "personal knowledge why a suit was brought against the [Authority]." *Id.*

### C.    The Tender and the Response

9

On June 5, 2014, the New York City Law Department, on behalf of the Plaintiffs, notified Liberty of the Plaintiffs' receipt of the James Complaint by letter. Pl. 56.1 ¶ 15; Def. Resp. ¶ 15. In that letter, the Plaintiffs provided a copy of the James Complaint, and demanded Liberty provide a defense pursuant to the terms of the Policy. Pl. 56.1 ¶ 15; Def. Resp. ¶ 15. The Law Department sent similar tender letters containing the Mertz Complaint and the Guarnaccia Complaint on June 12, 2014, and July 24, 2014, respectively. Pl. 56.1 ¶¶ 24, 31; Def. Resp. ¶¶ 24, 31.

By letter dated August 6, 2015 (well over a year after receiving the tenders), Liberty responded. *See* Pl. 56.1 ¶ 33; Def. Resp. 56.1 ¶ 33; Dkt. No. 32-9 (Aug. 6, 2015 Letter). In that letter, Liberty denied any obligation to defend as to all three actions. As to the James Complaint, Liberty stated that "[o]ur investigation has revealed that the [Authority] did not own, manage, or maintain P.S. 11 and was not performing work at this school at the time of the accident." *Id.* at 2 As to the Mertz Complaint, Liberty again explained that its investigation "has revealed that [the Authority] did not own, manage, or maintain the ACE Academy, that the [Authority] has not performed work on the portable staircase, and that the [Authority] completed its work on an unrelated portion of the premises in November 2012." *Id.* at 3. Finally, as to the Guarnaccia Complaint, Liberty affirmed that its investigation "revealed that the [Authority] did not own, manage, or maintain P.S. 234 [where Ms. Guarnaccia's alleged fall occurred in 2013], and was not performing work at this location at the time of the accident." *Id.* at 3.

Liberty then summarized its decision as to all of the actions follows: it noted that, under the Additional Insured portion of the Policy, the City and the DOE did not qualify as additional insureds "unless the bodily injury [alleged] was caused, in whole or in part, by [either] (a) the [Authority's] ongoing operations or (b) in connection with premises owned or rented by the

10

[Authority]." *Id.* at 6. "Based on [Liberty's] review of the Complaints" in the three actions stated above, it concluded that the alleged injuries "were not caused, in whole or in part, by the [Authority's] ongoing operations or in connection with premises owned or rented by the [Authority]," and thus that there was no duty to defend. *Id.*

On August 13, 2015, the Law Department responded in a letter. Dkt. No. 32-10. In that letter, the Department stated, first, that the qualifications built into the Additional Insured endorsement adding the City and the DOE to the policy were exclusions, and that Liberty's delay in responding to the initial tender letter waived its right to invoke those exclusions. *Id.* at 2. The letter further argued that the allegations in the complaints triggered Liberty's duty to defend, regardless of the results of Liberty's investigation of the objective facts. *Id.* at 4-6.

On September 2, 2015, Liberty responded, maintaining its position that it had no duty to defend on the basis that "the [alleged] accidents were not caused by the acts or omissions of the the [Authority] or the acts or omissions [of] those acting on [its] behalf in the performance of ongoing operations." Pl. 56.1 ¶ 45; Def. Reply 56.1 ¶ 45.

This action followed.

## II.     Legal Standard

The Court may award summary judgment to a moving party if, after reviewing the parties' submissions in the light most favorable to the non-moving party, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). As a general matter,

11

"whether an insurer has an obligation to defend is a question of law for the courts." *Burt Rigid Box Inc. v. Travelers Prop. Cas. Corp.*, 126 F. Supp. 2d 596, 634 (W.D.N.Y. 2001), *aff'd in part, rev'd in part on the grounds*, 302 F.3d 83 (2d Cir. 2002) ("Burt 1").

## III. Discussion

It is well-settled that, under New York Law, "[a]n insurer's duty to defend its insured is exceedingly broad." *Regal Constr. Corp. v Nat'l Un. Fire Ins. Co. of Pittsburgh, PA*, 15 N.Y.3d 34, 37 (N.Y. 2010) (internal quotation marks omitted). As the Second Circuit, interpreting New York law, has held, this "duty ... is broader than [the insurer's] duty to indemnify." *Burt Rigid Box, Inc. v. Travelers Property Cas. Corp.*, 302 F.3d 83, 97 (2d Cir. 2002) ("Burt 2"). Thus, although the duty to indemnify is generally not adjudicated until the end of a proceeding and may turn on the outcome of that proceeding, an "insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage." *Regal*, 15 N.Y.3d at 37 (internal quotation marks and alteration omitted).

Relying on these settled principles, the Plaintiffs argue that the Defendant had a duty to defend them in each of the underlying actions, and that Liberty's failure to do so breached its obligations under its insurance contract. *See generally* Dkt. No. 31 ("Pl. Mem."). Specifically, Plaintiffs argue, first, that the allegations in each of the complaints "suggested ... a reasonable possibility" of coverage under the indemnity provisions; and second, that, assuming the allegations suggested such a possibility, extrinsic evidence showing that the Authority's ongoing operations did not, in fact, cause the underlying plaintiffs' injuries is irrelevant. *See id.* Third, and in the alternative, Plaintiffs argue that the ongoing operations requirement in the insurance policy is an exclusion, and that Liberty's failure to timely disclaim coverage "bar[s it] from disclaiming coverage based upon [that] exclusion" pursuant to New York Insurance Law §

12

3420(d). *The Allen-Stevenson Sch. v Burlington Ins. Co.*, Index No. 0603036/2006, 2008 N.Y. Misc. LEXIS 10587, at \*10 (N.Y. Sup. Ct. Mar. 31, 2008); *see also 492 Kings Realty, LLC v 506 Kings, LLC*, 88 A.D.3d 941, 943, (N.Y. App. Div. 2d Dep't 2011) ("Insurance provisions that cover only ongoing operations or, conversely, do not cover completed operations, have routinely been treated as policy exclusions").

The Defendant disputes that any duty to defend ever existed as to the underlying actions or exists now. *See* Dkt. No. 36 ("Def. Mem."). To that end, it argues, first, that the underlying complaints failed to allege that the Authority's ongoing operations caused the underlying plaintiffs' injuries; and second, that, even if the complaints did so allege, extrinsic evidence presented in this litigation establishes as a matter of law that the injuries were not caused by the ongoing operations of the Authority and thus terminates any duty to defend. *See Allstate Ins. Co. v. Zuk,* 78 N.Y.2d 41, 45 (N.Y. 1991) (holding that, if an insurer demonstrates that "as a matter of law[,] there is no possible factual or legal basis on which [the insurer] might eventually be obligated to indemnify its insured under any policy provision," the duty to defend terminates). Last, addressing the Plaintiffs' alternative argument that Liberty's disclaimer was untimely, the Defendant argues that the ongoing operations restriction is not a policy exclusion, but a necessary element of coverage, and thus that timely disclaimer was not required under New York law. *See* Def. Mem. at 25 (citing *Worcester Ins. Co. v. Bettenhauser*, 95 N.Y.2d 185, 188 (N.Y. 2000) ("Disclaimer pursuant to section 3420(d) is unnecessary when a claim falls outside the scope of the policy's coverage portion.")).

Addressing these arguments in detail below, the Court holds as follows. First, the Court agrees with the Plaintiffs that the underlying complaints "contain[] ... allegations which bring the claim[s] ... potentially within the protection purchased," and thus holds that, according to

13

New York insurance law, receipt of these complaints triggered Liberty's duty to defend. *Regal*, 15 N.Y.3d at 37 (internal quotation marks omitted). Second, the Court holds that, under the circumstances of this case, the Defendant's extrinsic evidence does not terminate or affect that duty. On this basis, the Court grants summary judgment to the Plaintiffs on all of their claims, and denies summary judgment to the Defendant. Having resolved the issue on the basis of the Plaintiffs' primary arguments, the Court does not address the Plaintiffs' alternative argument as to the timeliness of disclaimer.

### A.     The Allegations in the Underlying Complaints Triggered the Duty to Defend

The Court first holds that, because the allegations in each of the three underlying complaints "suggest a reasonable possibility of coverage," the Plaintiffs' tender of these complaints to the Defendant triggered Liberty's duty to defend. *Regal*, 15 N.Y.3d at 37 (internal quotation marks and alteration omitted).

As noted, under New York law, "[t]he duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer has actual knowledge of facts establishing a reasonable possibility of coverage." *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (N.Y. 1997) (internal quotation marks omitted). As the Second Circuit has stated, "[i]f the allegations of the complaint are even *potentially* within the language of the insurance policy, there is a duty to defend." *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 82–83 (2d Cir. 2013) (quoting *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443 (N.Y. 2002)) (emphasis added); *see also Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F. Supp. 1416, 1424 (S.D.N.Y. 1991) (noting that, only "if an insurer can demonstrate as a matter of law that the allegations of the underlying complaint do not bring

the claim within the coverage afforded by the policy," will "the insurer [have] no duty to defend").

It is generally not relevant to the duty to defend whether the allegations in a complaint are, objectively, *true*. *See Goldberg v. Lumber Mut. Cas. Ins. Co., of N.Y.*, 297 N.Y. 148, 152 (N.Y. 1948) (noting, in a case addressing the contours of a contractual duty to defend nearly identical to the one in this case, that "the insurer obligated itself to handle the defense of actions against the insured whenever the complaint served upon him alleged a state of facts covered by the policy, regardless of whether such allegations squared with objective truth or were utterly false and groundless"); *accord Kincaid v Simmons*, 66 A.D.2d 428, 431 (N.Y. App Div. 4th Dep't 1979). Courts addressing the contours of the duty to defend thus ask what the complaint alleges, not what the objective state of reality is.[6]

As is suggested by the above legal standard, allegations in a complaint need not *clearly* bring the complaint within the insurance contract's indemnity provision to trigger a duty to defend. Instead, courts – including the Second Circuit (interpreting New York law), have repeatedly held that, if a complaint is *ambiguous* as to a fact material to coverage, the ambiguity must be resolved in favor of the insured. *See Suburban Bindery Equip. Corp. v. Boston Old Colony Ins. Co.*, 150 A.D.2d 767, 767 (N.Y. App. Div. 2d Dep't 1989) ("Any doubt as to whether the allegations state a claim covered by the policy must be resolved in favor of the insured."); *Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 424–25 (2d Cir. 2002) ("IBM 1"); *Lee v. Aetna Casualty & Surety Co.*, 178 F.2d 750, 753 (2d Cir. 1949) (Opinion of Learned Hand) (acknowledging that a complaint appeared to allege multiple, mutually exclusive factual theories, only some of which would trigger the duty to indemnify, and

---

[6] The Court addresses the relevance of extrinsic evidence to this inquiry, *infra. See* Part III.B.

concluding that "[w]hen ... [a] complaint comprehends an injury which *may* be within the policy, we hold that the promise to defend includes it" (emphasis added)).

Finally, "[i]f any of the claims against the insured arguably arise from covered events, the insurer is required to defend the *entire* action." *Frontier*, 91 N.Y.2d at 175 (emphasis added).

In the instant case, the question is whether the allegations in the three underlying complaints even *potentially* suggest injuries "caused, in whole or in part, by [the Authority's] acts or omissions or the acts or omissions of those acting on [its] behalf ... [i]n the performance of [the Authority's] ongoing operations." Policy at 93. The Court holds – as to each complaint – that the allegations do so.

As an initial matter, the Court notes that the nature of the ongoing operations limitation – as a policy exclusion or as a precondition to liability – is relevant to the Court's determination of whether the allegations in these complaints triggered the duty to defend.[7] As noted, it is generally the case that a complaint's allegations need only "potentially" be "within the language of the insurance policy" to trigger that duty. *CGS Indus., Inc.* 720 F.3d at 82-83 (internal quotation marks omitted). Notwithstanding this already lenient standard, the New York Court of Appeals has held that, when an insurer seeks to show that the allegations in a complaint "cast the pleadings wholly within [a policy] exclusion," the insurer bears an even heavier burden to demonstrate the absence of a duty to defend. *Frontier*, 91 N.Y.2d at 175. "To be relieved of its duty to defend on the basis of a policy exclusion, the insurer ... [must demonstrate] that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis

---

[7] As already noted, the Court need not, and does not, reach the question of whether the ongoing operations limitation is formally an exclusion for purposes of the timeliness of a disclaimer under § 3420.

upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision." *Id.* The Plaintiffs correctly observe that several New York courts have held that an ongoing operations limitation counts as an exclusion, at least for purposes of the instant analysis. *See 492 Kings Realty, LLC*, 88 A.D.3d at 943 (stating, in the context of an ongoing operations limitation in an additional ensured endorsement, that "[i]nsurance provisions that cover only ongoing operations or, conversely, do not cover completed operations, have routinely been treated as policy exclusions" (collecting cases)). The Plaintiffs thus argue that the Defendant bears a "heavy burden" if it seeks to show that the allegations in the underlying complaints allege only completed operations. *Frontier*, 91 N.Y.2d at 175.

In response, the Defendant makes no compelling argument why the Court should not treat the ongoing operations limitation as an exclusion for purposes of the Court's analysis of the duty to defend. In opposing the Plaintiff's *distinct* argument that Liberty's disclaimer was untimely under § 3420, the Defendant argues that the ongoing operations limitation is not an exclusion for purposes of *that* statute. Def. Mem. at 25. But its explanation of why that is the case all but concedes that the ongoing operations provision should be treated as an exclusion for purposes of the instant analysis of the complaints' allegations. The Defendant, seeking to show that it had no duty to timely disclaim, distinguishes *492 Kings* on the ground that that case did not address § 3420(d), and held only that an ongoing operations restriction is "similar to an exclusion" for purposes of the duty to defend. *Id.* (citing *492 Kings Realty*, 88 A.D.3d at 943). The Defendant nowhere argues, however, that *492 Kings* incorrectly treated the ongoing operations limitation as an exclusion for purposes of analyzing that duty. Treating the ongoing operations limitation as an exclusion for purposes of the instant analysis, there is no question that the Defendant cannot meet its "heavy burden of demonstrating that the allegations of the complaint cast the pleadings

wholly within" that exclusion. *Frontier*, 91 N.Y.2d at 175. On this basis alone, the Court finds that the complaints allege potentially covered injuries.

In any event, even were the Court to assume, *arguendo*, that the ongoing operations provision is not an exclusion, analysis of the allegations in the underlying complaints makes clear that they "potentially give rise to ... covered claim[s]." *Frontier*, 91 N.Y.2d at 175.

Under New York law, "[t]he term 'ongoing operations' is interpreted broadly." *Town of Fort Ann v. Liberty Mut. Ins. Co.*, 69 A.D.3d 1261, 1262–63 (N.Y. App. Div. 3d Dep't 2010). New York courts have thus found operations to be ongoing for purposes of insurance policies when "major construction ... had ended one to two months before" an accident, "[but] inspection of the project ..., which was required before [the construction] work was considered completed under the contract, had not yet occurred," *id.* at 1263; as well as where, after a contractor had already replaced radiator valves, "the tests designed to assure proper performance remained undone," *Perez v. N.Y.C. Hous. Auth.*, 302 A.D.2d 222, 222 (N.Y. App. Div. 1st Dep't 2003). The phrase "caused, in whole or in part," requires that an action be the proximate cause of an injury. *See Burlington Ins. Co. v. NYC Transit Auth.*, 79 N.E.3d 477, 483 (N.Y. 2017). Thus, the question in this case is whether the complaints potentially alleged that the Authority's ongoing operations were the proximate cause of the underlying plaintiffs' injuries. Before turning to the complaints' allegations, the Court addresses other cases that have assessed the sufficiency of parallel allegations.

Several courts have addressed what a complaint must allege to suggest that an injury was potentially caused by the insured's ongoing operations. In *492 Kings Realty*, the insurer presented extrinsic evidence suggesting that operations at a construction site had ceased prior to an accident, and thus that the underlying claim was not covered. *See 492 Kings Realty, LLC*, 88

18

A.D.3d at 943. The court (although treating the ongoing operations provision as an exclusion), held that an "allegation by [the underlying plaintiff] that the property damage arose out of the defendants' negligence in 'conducting' the construction project was broad enough to encompass a claim under the policy ..., thus triggering a duty to defend." *Id.*

In *Kincaid*, the insured informed the insurance company that he had completed his operations at the relevant premises prior to the date of the alleged accident. 66 A.D.2d at 429-30. The court held that the allegations in the complaint nevertheless triggered the duty to defend because the "plaintiffs' broadly framed complaint state[d] that each defendant engaged in the construction of the structure [and] alleged negligence on the part of each defendant in supervising, maintaining and exercising control pertaining to premises then under construction." *Id.* at 430-31.

In *City of New York v. Endurance Am. Ins. Co.*, the First Department held that a complaint's allegations gave "rise to the reasonable possibility of recovery under the policy" because the "underlying complaint allege[d] that the plaintiff's injuries arose out of the negligence of [the underlying defendants] in maintaining the 'traffic and pedestrian control devices' at the intersection where the plaintiff was struck by a car." 98 A.D.3d 900, 901 (N.Y. App. Div. 1st Dep't 2012).[8]

Finally, in *Employers Insurance Company of Wausau v. Northfield Insurance Company*, Judge Weinstein addressed an insurance policy stating that coverage terminated when a given door had been "put to its intended use by any person" other than the contractor. 150 F. Supp. 3d

---

[8] As in *492 Kings* and *Kincaid*, the insurer in *Endurance* argued that record evidence "establish[ed] that [the] operations at the subject intersection had been completed and thus were no longer ongoing at the time of the accident," although, unlike in those cases, the court appeared to dismiss that contention not because it was irrelevant, but because the court found it was not true. *Id*

196, 201 (E.D.N.Y. 2015). The complaint alleged that the underlying plaintiff had used the door – an allegation Judge Weinstein concluded indicated that the construction "work had been completed and the Policy was no longer applicable." *Id.* Nevertheless, Judge Weinstein noted that the underlying complaint also alleged that "[the construction] work included 'manag[ing] and controll[ing]' the door in question." *Id.* On the basis of these latter allegations, and notwithstanding the former allegation, he held that there was a duty to defend. *Id.*[9]

Applying general principles of New York insurance law, and comparing the complaints to the allegations in the above cases, the Court finds that each of the underlying complaints alleged claims "potentially within the language of the insurance policy." *CGS Indus., Inc.*, 720 F.3d at 82 (internal quotation marks omitted). The Court addresses each complaint in turn.

### 1. The James Complaint Alleges an Injury Potentially within the Language of the Insurance Policy

First, the James Complaint's allegations suggest a potentially covered injury. As noted, James alleges that she was injured when she tripped, slipped, or fell on a defective sidewalk abutting P.S. 111. *See generally* James Complaint. Specifically, she alleges that on February 14, 2013 (the date of her accident), the Authority "own[ed]," "was a lessee of," "was a general contractor at," "operated," "maintained," "managed," "controlled," and "supervised," "the premises known as P.S. 111 …. [i]nclusive of the abutting sidewalk." *Id.* ¶¶ 25-33; *see also id.* ¶¶ 34-37 (alleging that "[o]n or before February 14, 2013," the Authority "repaired," "inspected," "constructed," and "designed" said premises). James further alleges that her injury

---

[9] In some of these cases, the respective court treated the ongoing operations requirement as an exclusion. *See, e.g., 492 Kings Realty, LLC*, 88 A.D.3d at 943. In others, the court did not appear to do so. *See, e.g., Endurance Am. Ins. Co.*, 98 A.D.3d at 900. As noted, the Court holds that, for purposes of the instant burden-shifting analysis, the ongoing operations limitation *should* be treated as an exclusion. It reiterates, however, that even assuming, *arguendo*, that that higher burden does not apply, the complaints' allegations still suggest an injury "potentially within the language of the insurance policy." *CGS Indus., Inc.*, 720 F.3d at 82. The Court observes that the holdings in cases that treat the ongoing operations requirement as an exclusion are relevant to the Court's inquiry under this still-lenient standard.

"was caused solely by the negligence, carelessness and recklessness of the defendants [including the Authority], in the ownership, leasing, operation, maintenance, management, control, supervision, construction, demolition[,] alteration, repair and/or inspection of the Aforesaid Premises." *Id.* ¶ 70. These allegations, read together, suggest that the Authority was responsible for a defect in the sidewalk – whether by creating it or by failing in its alleged responsibility to maintain the premises. They further at least potentially suggest that the defect in the sidewalk was caused by the Authority's ongoing operations – whether those operations constituted construction at the site (either on February 14, 2013, or shortly before, with operations continuing in even a minimal capacity), maintenance of the sidewalk, management of the area, or any of the numerous other theories of liability alleged. The allegations thus triggered the duty to defend.

### 2. The Mertz Complaint Alleges an Injury Potentially within the Language of the Insurance Policy

Similarly, the allegations in the Mertz Complaint – although broadly framed – suggest an injury that "may be within the [P]olicy." *Lee*, 178 F.2d at 752. Mertz alleges that she was injured when she fell while descending an exterior stairway (the "Transportable") at A.C.E. Academy. *See generally* Mertz Complaint. As to that injury, she alleges that the Authority was "the owner of the Transportable," that it "operated the … Transportable," that the Transportable was under the Authority's "control," and that the Authority, "its agents, servants, and/or employees, maintained" and "supervised the … Transportable." *Id.* at 4-6. The Mertz Complaint also alleges that it was the duty of the Authority "to have and keep the … Transportable in a safe and proper manner," that "prior to May 8, 2013, [the Authority] performed certain work on the transportable at the aforesaid school premises," and that the Authority "designed," "installed," and "repaired," the Transportable. *Id.* at 6-7. As to her fall,

specifically, Mertz alleges that the unsafe condition of the Transportable was caused by "the negligence, carelessness and recklessness of the defendants ... in the ownership, operation, management, maintenance, supervision and control of the aforesaid school and/or the work performed at the school and/or transportable stairway and/or steps at the aforesaid location." *Id.* at 8.

It is true that the Complaint specifically alleges that the Authority performed work "prior to" to the accident date, *id.* at 6, which the Defendant suggests indicates that any such work was necessarily completed, Def. Mem. at 11. But this allegation – coupled with the general allegations that the Authority maintained the staircase – suggests the reasonable possibility that, even if such work had in a primary sense concluded, maintenance, supervision, or testing could have been ongoing. *See Town of Fort Ann*, 69 A.D.3d at 1262 (holding that, under New York law, "the term 'ongoing operations' is interpreted broadly"). In short, the complaint alleges that the Authority was responsible for the staircase, had performed construction work on it, and had an ongoing obligation to maintain it. These allegations thus triggered Liberty's duty to defend.

### 3. The Guarnaccia Complaint Alleges an Injury Potentially within the Language of the Insurance Policy

Finally, the Guarnaccia complaint also alleges a potentially covered injury. Guarnaccia alleges that she was injured while walking on the sidewalk in front of I.S. 234. *See generally* Guarnaccia Complaint. She alleges that her accident was a result of the negligence of the Authority in "the maintenance, control, operation and supervision of the premises, sidewalk and subject accident location." *Id.* ¶ 40. She also alleges that the Authority "caus[ed], permit[ted], and allow[ed] a hazardous and trap like and tripping condition to develop at the [accident] location (including *but not limited to* allowing defective and dangerous conditions such as uprooted tree roots to extend out into its sidewalk and to cause and create the cement sidewalk to

22

be and become cracked, uneven and trap like)." *Id.* ¶ 41 (emphasis added). These allegations

suggest that the Authority may have maintained the sidewalk itself, and at minimum suggest that

it maintained the surrounding premises. Guarnaccia's complaint thus alleges that her injury was

potentially caused by the Authority's ongoing operations. These allegations, as with those in the

other complaints, triggered the Defendant's duty to defend.

The Court further notes that extrinsic evidence available at the time that Liberty

disclaimed also and independently triggered the duty to defend as to the Guarnaccia action.

Although evidence available at that time did not conclusively establish that Guarnaccia's

accident was caused by the Authority's construction, it did indicate both that there was

construction in the vicinity of her accident and that she potentially brought her claim against the

Authority for that reason. *See* Dkt. No. 32-10 (in which the Plaintiffs highlighted some of this

evidence for the Defendant in a letter arguing entitlement to a defense); Ex. R at 76 (in which,

asked why she had sued the Authority, Guarnaccia initially testified "[i]t was because of the

scaffolding"). This evidence, viewed in light of the allegations in the complaint, independently

triggered a duty to defend. *See Fitzpatrick*, 78 N.Y.2d at 67 (holding that an insurer must

"provide a defense where, notwithstanding the complaint allegations, underlying facts made

known to the insurer create a reasonable possibility that the insured may be held liable for some

act or omission covered by the policy" (internal quotation marks omitted)).

Each of the complaints, then (as well as extrinsic evidence in the Guarnaccia action)

triggered Liberty's duty to defend.

### 4. The Defendant's Counterarguments Are Unavailing

Notwithstanding the broadly-worded allegations in these complaints, the Defendant

argues that they fail to even potentially allege covered injuries. The Defendant correctly

23

observes that none of the complaints contain clear, specific allegations expressly alleging ongoing operations. *See* Def. Mem. at 11. It thus argues that the "shotgun allegations" are insufficient to allege covered injuries. Def. Mem. at 9 (quoting *Atlantic Mut. Ins. Co. v Terk Tech. Corp.*, 309 A.D.2d 22, 29 (N.Y. App. Div. 1st Dep't 2003)). Not so.

The Defendant is right that the complaints are broadly worded, and that they leave some ambiguity as to the precise role of the Authority in the causation of the alleged injuries. Nevertheless, the fact that the complaints are broadly worded or ambiguous as to facts material to indemnity does not change the outcome of this analysis. Each complaint alleges that the Authority was responsible for the accidents in question, that it had the responsibility to maintain the areas in question, and that it had engaged in construction or repair work at that location – whether on the day in question or at some unspecified previous time. Because the complaints "comprehend[] ... injur[ies] within the policy," they triggered the duty to defend – notwithstanding any ambiguities. *Lee*, 178 F.2d at 752; *Kincaid*, 66 A.D.2d at 429-30.

In sum, the allegations in these complaints at least suggest claims "potentially within the language of the insurance policy," and the tender of them to Liberty triggered its duty to defend as to each action. *CGS Industries, Inc.*, 720 F.3d at 82.

### B. Extrinsic Evidence Does Not, Under the Circumstances, Defeat or Terminate the Duty to Defend

Even assuming the allegations in the complaints allege potentially covered injuries, Liberty argues that it has no duty to defend. According to Liberty, the evidence it has introduced in this litigation conclusively establishes that the Authority had no ongoing operations in proximity to the James and Mertz accidents, and that the Authority's construction project near the site of the Guarnaccia accident – although an ongoing operation – was not the proximate

cause of her injury. Because this evidence (extrinsic to the allegations in the complaints) establishes "as a matter of law that there is no possible factual or legal basis on which [Liberty] might eventually be obligated to indemnify its insured under any policy provision," Liberty argues that it terminates Liberty's duty to defend. *Burt*, 302 F.3d at 97 (Burt 2) (quoting *Zuk*, 78 N.Y.2d at 45). Although the Court agrees that there is some ambiguity as to the precise contours of the extrinsic evidence rule under New York insurance law, the Court holds that extrinsic evidence does not affect Liberty's duty to defend in this case.

The question of when facts extrinsic to a complaint may either prevent the attachment of a duty to defend or terminate that duty (at a subsequent date, by judicial decree) remains somewhat unclear under New York law. *See Stein v. N. Assur. Co. of Am.*, 617 F. App'x 28, 31 n.4 (2d Cir. 2015) (summary order) ("We have previously recognized that New York law is 'unclear' regarding the circumstances in which a court may consider extrinsic evidence in making coverage determinations." (quoting *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 148 n.4 (2d Cir. 2004) ("IBM 2"); *Int'l Bus. Machs. Corp.*, 303 F.3d at 426 (IBM 1) ("[T]here is no consistent rule from New York's lower courts [as to] whether New York law allows reference to extrinsic evidence in determining the duty to defend."). Notwithstanding this lack of clarity, the Second Circuit – even as it has disclaimed insight into the precise contours of New York law on this question – has suggested that extrinsic evidence may terminate the duty to defend in certain circumstances. *See Int'l Bus. Machs*, 363 F.3d at 148 (IBM 2) ("[T]he general rule in determining whether an insurer has a duty to defend is to compare the allegations of the complaint with the operative insurance policy. A narrow, but widely recognized exception to the rule allows an insurer to refuse or withdraw a defense if evidence extrinsic to those sources and 'unrelated to the merits of plaintiff's action[,] plainly take the case outside the policy coverage.'"

(quoting Allan D. Windt, *Insurance Claims and Disputes,* § 4:4 at pp. 293–94 (West 2001));

*Burt*, 302 F.3d at 97 (Burt 2) ("New York courts have, in appropriate cases, considered extrinsic evidence where that evidence may conclusively establish that an insurer faces no possible liability." (citing *Avondale Indus.*, 774 F. Supp. at 1424–25) (collecting cases)).

The Court assumes, *arguendo*, that under New York law, extrinsic evidence may, in certain cases, either justify an insurer in refusing to defend, or form the basis of a later and successful motion for termination of that duty. Nevertheless, the Court holds that the extrinsic evidence in *this* case has no such effect, for two reasons. First, even assuming extrinsic evidence may be relevant to the duty to defend, it is only the rarest case where such evidence may justify an insurer in refusing to defend in the first instance (rather than forming the basis for the insurer to file a subsequent motion to terminate that duty). As the Court explicates below, this is not such a case. Second, and independently, the extrinsic evidence the Defendant has presented goes to an issue relevant to the merits of the underlying complaints. Under clearly established New York law, then, such evidence cannot justify Liberty's refusal to defend or provide a basis, in a collateral proceeding, for a declaration terminating that duty.

### 1. Even if Extrinsic Evidence Could Terminate Liberty's Duty to Defend, it Had No Basis to Refuse to Interpose a Defense in the First Instance

First, the Court holds that, even if the evidence presented herein could form a basis for a motion to terminate Liberty's duty to defend, the Defendant had no basis relying on this evidence to refuse to interpose a defense in the first instance. An analysis of New York cases addressing the duty to defend explains this conclusion.

Although various decisions interpreting New York law have suggested that extrinsic evidence may end a duty to defend, such cases have generally held only that the presentation of such evidence to a court may entitle an insurer to a declaration *terminating* the duty as a

26

*prospective* matter, not that an insurer may refuse to defend as an *initial* matter based on its own investigation. *See, e.g., Burt Rigid Box*, 126 F. Supp. 2d at 635 (Burt 1) ("'[W]here a court can determine conclusively that there is no genuine dispute as to an extrinsic fact which when applied to the underlying allegations limits them to a claim not covered by the policy, the insurer no *longer* need defend' ... Nevertheless, the insurer remains liable for the defense costs incurred in defending the claims asserted in the underlying action *until a judicial determination that it is not required to defend such claims*." (quoting *Avondale Indus.*, 775 F. Supp. at 1324 (emphasis added)); *Colon v Aetna Life & Cas. Ins. Co.*, 66 N.Y.2d 6, 10 (N.Y. 1985) (holding that, where an insurer conducted its own investigation and concluded that a driver had been operating a vehicle without the owner's consent, but the underlying complaint alleged such consent, the insurer was not permitted to rely on its own investigation to refuse a defense – instead, the insurer should have assumed the defense of the action and sought a "prompt judicial determination, whether by summary judgment, declaratory judgment or otherwise that, contrary to the allegations of the personal injury plaintiff's complaint, the driver actually did lack permission of the insured, and that the insurer is not obligated by its contract of insurance to furnish a defense to the driver")[10]; *Maryland Cas. Co. v. Pearson*, 194 F.2d 284, 287 (2d Cir. 1952) ("While we agree that, since [the underlying plaintiff] was determined to be an employee of [the insured] and entitled to workmen's compensation under the New York law, the [insurance company] was not liable to defend the suit [the underlying plaintiff] brought, it does not necessarily follow that the appellee could refuse to defend prior to that determination. ... [I]f the

---

[10] The Court of Appeals, in language relevant to this case, observed that such an approach was preferable to a rule that would permit the insurer to simply refuse coverage, as "a contrary holding ... might encourage refusals to defend where the circumstances were less clear, because there would be little risk in doing so. If the person denied a defense were subsequently found to have been operating the vehicle without consent, the insurer would have incurred no cost, and if consent were found the insurer would merely reimburse the attorneys' fees it would have incurred anyway." *Id.*

complaint in the suit brought alleged, or at least, did not exclude, a basis for recovery for which the insurer would be liable, the insurer was obliged to defend the suit 'until it could confine the claim to a recovery that the policy did not cover.' This was not done until the judgment herein below was entered and, consequently, the appellee did have an obligation to defend the suit until that time." (quoting *Lee*, 178 F.2d at 753)).

Courts addressing the duty to defend have, further, made clear that, if the allegations in a complaint trigger the duty to defend, the insurer's duty *continues* until a judicial decree terminating it. In other words, a subsequent decree terminating the duty on the basis of extrinsic evidence does not *retroactively* eliminate the duty that initially arose. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 622–23 (2d Cir. 2001) (finding that, where there was uncertainty as to whether, under the law, indemnity was possible, "[i]t was, ... incumbent upon [the insurer] to undertake a defense ... *until* the uncertainty surrounding ... was resolved" (emphasis added)); *id.* ("Had [the insurer] sought a declaratory judgment immediately upon [the insured's] filing of its insurance claim, a court might have eliminated this uncertainty ... before [the insurer] expended a great deal of money putting up a defense .... But until such a ruling issued, the question of whether [the insurer] might be held liable to indemnify [the insured] was in doubt. And, given this doubt, [the insurer's] failure to provide a defense for [its insured] in the infringement suit was a violation of its contractual duties."); *accord Maryland Cas. Co.*, 194 F.2d at 287; *Burt Rigid Box*, 126 F. Supp. 2d at 635 (Burt 1).

It is true that, in rare circumstances, New York courts have granted declaratory relief to insurers affirming their refusal to offer a defense in the first instance on the basis of extrinsic evidence. *See, e.g., Town of Moreau v. Orkin Exterminating Co.,* 165 A.D.2d 415, 418, (N.Y. App. Div. 3d Dep't 1991). But such cases often rest on estoppel principles (such that a judicial

decree has *already* established that there is no duty to indemnify). *See, e.g., id.* ("Accordingly, applying the principle of collateral estoppel, [the New York] Supreme Court properly considered [the insured's] criminal convictions ... and determined that the convictions precluded defendants from contending that the burial of pesticides was unintentional.").

In any case, even if it may be appropriate to refuse coverage in certain other cases on the basis of extrinsic evidence absent a prospective judicial decree, there is no question that this case would not be one of them. Liberty's evidence in this action arises from the procedural history of the underlying actions, and in many cases post-dates the dates on which Plaintiffs provided their tender letter. *Compare, e.g.,* Def. Ex. K. (providing an April 15, 2015, affidavit of Gordon Tung created in the Mertz action); *with* Pl. 56.1 ¶ 24 (describing the June 12, 2014, tender letter as to the Mertz action). The Second Circuit has expressed its "doubt" that under New York law an insurer may – years after an action began – retroactively terminate its duty to defend on the basis of evidence that arose *after* the date of tender. *See Int'l Bus. Machs. Corp.*, 303 F.3d at 426-27 (IBM 1) ("We doubt that New York courts would reward Liberty Mutual by considering extrinsic evidence flushed out as a result of its unwillingness to take a position regarding the [underlying] claim for over three years. To sanction this would undermine the 'well established' principle 'that a liability insurer has a duty to defend its insured in a pending lawsuit if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered.'" (quoting *Fitzpatrick,* 78 N.Y.2d at 63)); *see also id.* at 426 n.3 ("In each of the [New York] cases Liberty Mutual cites where extrinsic evidence was used by an insurer to evade the duty to defend, the extrinsic evidence in question was available at the time the insurer was given the complaint.").

In short, even if, relying on the extrinsic evidence in this action, Liberty could seek a prospective decree terminating its duty to defend, there is no basis for holding that Liberty could rely on this evidence to refuse to defend in the first place. On this basis alone, the Court may grant summary judgment to the Plaintiffs on their claims for defense costs in the underlying actions.

**2. Liberty Cannot Rely on Facts Related to the Merits of the Underlying Actions to Defeat or Terminate its Duty to Defend**

As noted, the Court's holding that this is not the rare case where an insurer can refuse to interpose a defense based upon extrinsic evidence requires the Court, at a minimum, to grant summary judgment to the Plaintiff on its claims seeking defense costs thus far accrued. Nevertheless, on the basis of an independent argument, the Court finds that the Plaintiffs are entitled to summary judgment as to *all* of their claims. That is because, under well-established principles of New York law, Liberty cannot rely on extrinsic evidence in a collateral proceeding to defeat or terminate its duty to defend when the facts it seeks to establish are related to the merits of the underlying action.

As Liberty concedes, it is a "settled rule [under New York law] that extrinsic evidence can[not] be used to defeat the duty to defend ... [unless it is] 'unrelated to the merits of [the underlying] plaintiff's action.'" Def. Mem. at 18 (quoting *Int'l Bus. Machs. Corp.*, 363 F.3d at 148 (IBM 2)); *see also Allstate Ins. Co. v Santiago*, 98 A.D.2d 608, 608–09 (N.Y. App. Div. 1st Dep't 1983) ("[T]he policy in this State has been to deny the declaratory judgment where the matter in dispute can be determined in the basic negligence action but to permit the action when the dispute is such that it depends on matters outside of the negligence action or will not arise in the negligence action as a part of the lawsuit." (internal quotation marks omitted)); *cf. Avondale*

*Indus*, 774 F. Supp. at 1425 ("While as a general rule, such a determination [that extrinsic evidence terminates a duty to defend] is made only by the court hearing the underlying action itself, where the factual issue central to the insurance coverage dispute is collateral to the underlying action, so that it is irrelevant to the underlying action and will not be addressed there, the court which has jurisdiction over the declaratory coverage action may make the determination."); *accord Am. Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 565 F. Supp. 1485, 1500 (S.D.N.Y. 1983), *aff.* 748 F.2d 760 (2d Cir. 1984).

When an insurer believes that undisputed facts relevant to the merits of the underlying action prove that the alleged injuries do not fall within the indemnification provisions, then its recourse is not to seek a declaratory judgment that it has no duty to defend. Instead, it must defend the action and seek to prove, in that action, the existence of the facts – at which point, it may withdraw its defense. *See Greenwich Ins. Co. v. City of N.Y.*, 997 N.Y.S.2d 32, 34 (N.Y. App. Div. 1st Dep't. 2014) ("Because the underlying complaints pleaded claims that were potentially within the scope of coverage, plaintiff is obligated to defend the underlying actions. Whether plaintiff might ultimately be able to establish that its insured did not cause the injuries alleged in the underlying actions involves questions of fact yet to be resolved; it is not an issue that can be determined as a matter of law by examination of the insurance contract. Thus, it does not afford a basis to relieve plaintiff of its duty to provide a defense."); *accord Lee*, 178 F.2d at 753. Such a rule follows from the basic structure of the duty to defend. That duty, which is *broader* than the duty to indemnify, includes the duty to defend against meritless suits. *See Burt Rigid Box*, 302 F.3d at 97 (Burt 2). If an insurer could defeat its duty by proving, in a collateral action, the existence of a fact that *is* relevant to the merits of the underlying suit, it would follow that the insurer could subvert its obligation to defend against meritless suits. Worse, such a

posture would place the insured in an untenable position: the insured would have to argue, in the declaratory action, that the fact in question is disputed, even as the insured made the *opposite* argument in the underlying action to try and defeat its own liability. Such an outcome would be clearly contrary to New York law. *See Cont'l Cas. Co. v. JBS Const. Mgmt., Inc.,* No. 09 CIV. 6697 (JSR), 2010 WL 2834898, at *3 (S.D.N.Y. July 1, 2010) ("To permit the insurer to withdraw its defense whenever it becomes clear that the underlying lawsuit is meritless would wholly undermine the well-established function of the duty to defend to serve as 'litigation insurance.'").

Applying this well-settled principle, the Court concludes that Liberty cannot defeat its duty to defend with extrinsic evidence here. That is because the three factual questions Liberty seeks to have this Court settle – whether the Authority had any ongoing operations in the vicinity of the James and Mertz accidents, and whether the Authority's undisputed ongoing construction activities near the site of the Guarnaccia accident contributed to that accident – are questions relevant to the merits of the underlying actions.[11] A simple examination of the filings in those cases makes this conclusion evident.[12]

---

[11] The Defendant does not argue that, if a given fact is material only to the Authority's liability for the underlying plaintiffs' injuries – but not to the liability of either the City or the DOE – then the fact is not relevant to the underlying actions. To the contrary, Liberty explicitly states that it "does not seek a declaration that would relieve the [Authority] of liability in the Underlying Actions." Def. Mem. at 19. The Court thus assumes that if a fact is relevant to the Authority's liability, it may not be resolved in this collateral proceeding, even though the Authority is not itself a Plaintiff in this action.

[12] Some of these filings have been provided by the parties. *See, e.g.*, Def. Ex. K. (declaration of Gordon Tung in support of the Authority's motion to dismiss the Mertz action). The Court takes judicial notice of the others. *See Glob. Network Commc'ns Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (internal quotation marks omitted)); *accord Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991); *U. S. ex rel. Geisler v. Walters*, 510 F.2d 887, 890 n.4 (3d Cir. 1975) (taking judicial notice of the content of filings in a habeas case – not for the truth of the matters asserted, but to determine what arguments were made).

### i. The Procedural History of the James Action Shows that the Existence of Ongoing Operations Is Relevant to the Merits of that Action

First, the procedural history of the James action makes evident that the question of whether James' injuries were caused by the Authority's ongoing operations is relevant to the merits of James' claims.

The James action, as already noted, began with the filing of the James Complaint on or around April 30, 2014. *See* James Complaint. On April 15, 2015, the Authority filed a motion to dismiss the James Complaint or, in the alternative, for summary judgment. *See* Notice of Motion, *Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 (N.Y. Sup. Ct. Apr. 15, 2015). As support for this motion, the Authority cited, *inter alia*, to the affidavit of Shephard Jaffess. Def. Ex. F. Jaffess stated in his affidavit that "[a]t the time of the [accident] … the [Authority] was not involved in any ongoing projects at the school, and likewise, did not retain a general contractor or construction manager to oversee construction and/or renovation at or near the premises." *Id.* ¶ 6. In arguing for dismissal, the Authority cited to this affidavit, and to the absence of ongoing operations, as proof that it did not owe a duty of care to James, and that she could not succeed on the merits of her claim against the Authority. *See* Reply Affirmation, *Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 at 4-5 (N.Y. Sup. Ct. July 20, 2015) (citing both to the Jaffess affidavit and to James' own testimony that she did not see any construction near the accident site); *id.* at 5 (arguing that "[a]s a general proposition under New York law, liability for a dangerous condition on real property must be predicated upon a defendant's Ownership, occupancy, control or special use of said property.").

---

In opposition to the Authority's motion to dismiss or for summary judgment, James argued that the Jaffess affidavit was self-serving and unsupported. Affirmation in Opposition, *Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 at 3-4 (N.Y. Sup. Ct. June 30, 2015). James also cited evidence that she claimed suggested that, as of the date of the accident, the DOE had assigned "management jurisdiction" to the Authority over the accident site. *Id.* at 4. In sum, James argued that the Authority had not submitted sufficient evidence to show, *inter alia*, that it had no ownership or responsibility of the subject premises on the date of the accident. *See id.* at 8 ("Plaintiff should be given an opportunity to explore these issues given defendants' exclusive knowledge of the nature, extent, and time of the construction, repair, and maintenance work performed on the subject sidewalk.").

The New York State Supreme Court denied the Authority's motion on July 23, 2015, stating that the materials it had submitted were insufficient and that discovery had not yet been completed. *See* Short Form Order, *Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 (N.Y. Sup. Ct. July 23, 2015). The Authority appealed on September 14, 2015. Notice of Appeal, *Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 (N.Y. Sup. Ct. Sept. 14, 2015). The most recent activity on the public electronic docket is an August 8, 2017, discovery order. *See* Compliance Conference Order, *Patricia James v. New York City School Construction Authority, New York City Department of Education, and City of New York*, Index No. 021897/2014 (N.Y. Sup. Ct. Aug. 8, 2015).

In short, a review of the docket in the James action makes clear that the precise factual question presented to the Court by Liberty is also a significant part of the Authority's defense in the underlying case. Liberty therefore may not avoid its duty to defend by arguing that extrinsic evidence establishes the absence of ongoing operations in the James action.

**ii.    The Procedural History of the Mertz Action Similarly Shows that the Existence of Ongoing Operations Is Relevant to the Merits of that Action**

Analysis of the procedural history in the Mertz action leads to the same conclusion. On May 13, 2015, the Authority moved to dismiss, and submitted the Tung affidavit as support. *See* Def. Ex. K. In that affirmation, Tung represented that "[a]t the time of the alleged incident, the [Authority] was not involved in any construction and/or renovation projects [at the premises]." *Id.* ¶ 6. On September 17, 2015, the New York State Supreme Court denied the motion. *See* Short-Form Order, *Kathleen Mertz v. The City of New York, the New York City Department of Education, and New York City School Construction Authority*, Index No. 006209/2014 (N.Y. Sup. Ct. Sept. 17, 2015). The court summarized the Authority's argument as follows: "In support of the motion, defendant submits *inter alia* the affidavit of Gordon Tung … that the [Authority] did not own, operate, manage, or maintain the premises where the accident occurred and that the [Authority] was not involved in any construction and or renovation projects at the subject location *at the time of the accident*." *Id.* at 2 (emphasis added)). The court denied the motion, however, stating that the Tung affidavit was "vague and conclusory" and not based on either personal knowledge or a review of documents, and that discovery was incomplete. *See id.* at 2-3.

On December 22, 2016, the New York State Supreme Court granted the Authority's motion for summary judgment. *See* Short-Form Order, *Kathleen Mertz v. The City of New York, the New York City Department of Education, and New York City School Construction Authority*,

Index No. 006209/2014 (Dec. 22, 2016). Its reasoning stated as follows: first, it noted that, to be liable, the Authority had to have actual or constructive notice of the relevant hazard. *Id.* at 2. Then it stated: "Moving defendant ... established that [the Authority] does not own, operate, maintain, or manage the subject premises, and that the [Authority] was not involved in any construction or renovation projects at the accident location at the time of the accident. Accordingly, movant established a prima facie case." *Id.*

In short, in the Mertz action, the issue of ongoing operations was a material question as to the Authority's liability, and the court ultimately dismissed the action as against the Authority (although not as against the other defendants) by finding the precise fact Liberty wants this court to now find: that there is no evidence of such operations. Liberty may not avoid its duty to defend in the Mertz action, then, by arguing that extrinsic evidence establishes the absence of ongoing operations as a matter of law.

### iii. The Procedural History of the Guarnaccia Action Shows that Whether the Authority's Ongoing Operations Caused Guarnaccia's Injury Is Relevant to the Merits of that Action

Finally, in the Guarnaccia action, Liberty argues that the evidence is clear that the Authority's ongoing construction project did not *cause* the underlying plaintiff's injury. *See* Def. Mem. at 22-25. The procedural history of that action makes evident, however, that the question of whether the Authority's ongoing operations caused Guarnaccia's injury is relevant to the merits of Guarnaccia's claim.

On July 27, 2017, the Authority moved for summary judgment in the Guarnaccia action. *See* Affirmation in Support, *Mary Anne V. Guarnaccia v. The City of New York, the New York City School Construction Authority, and the New York City Department of Education*, Index No. 505355/2014 (N.Y. Sup. Ct. July 27, 2017). In that motion (currently pending before the state court), the Authority argues that neither the Authority nor its contractor owed the Plaintiff a duty

36

or were responsible for the accident, because the ongoing construction did not cause that accident – Superstorm Sandy did. *See id.* at 2-3 (noting, *inter alia*, that the Authority "did not perform any physical work to the sidewalk at issue," that the scaffolding "in no way impacted the alleged defective condition," and that even plaintiff "does not believe that the sidewalk shed impacted the sidewalk, as she specifically testified the sidewalk had been raised/cracked by tree roots following Superstorm Sandy."). In other words, the Authority is presently attempting to have the New York State Supreme Court find, as a matter of law, the same fact on which Liberty here relies to defeat its duty to defend. The issue of causation is plainly relevant to the merits of the underlying action, and Liberty may not rely on it to defeat its duty to defend.

### iv.    Liberty's Counter-arguments Are Unavailing

In arguing that the facts it seeks to prove are unrelated to the merits of the underlying actions, Liberty suggests that the plaintiffs in the James and Mertz actions can succeed without proving *ongoing* operations – as long as they show that there were operations in the past. *See* Def. Opp. at 19 ("The [Authority's] liability in the Underlying Actions does not turn on whether its work was ongoing, but on whether its negligence, prior to the accident, was a proximate cause."). It also argues, without citation to any actual briefing in the Guarnaccia action, that Guarnaccia argues not that the construction project of the Authority caused the defective sidewalk, but that the Plaintiffs and Authority may have breached a duty to manage city tree wells. *Id.* at 24. To the degree not otherwise belied by the above citations to the *actual* issues in dispute in the underlying actions, these arguments miss the point. Liberty seems to suggest that, if a factual issue material to indemnification and defense is not *dispositive* of the underlying actions – i.e. if a plaintiff in those actions might succeed even without showing that fact – then the fact is not *relevant* to those actions. But this argument misstates the relevant standard. There

is no question that the plaintiffs in the underlying actions alleged ongoing operations, and that proving such operations would be one way of securing a judgment against the Authority – just as proving the absence of such operations is a core part of the Authority's defense. The fact that the plaintiffs might have alternative theories of causation – i.e. that they can win *without* proving these facts – does not render the facts "*unrelated* to the merits of [the] plaintiff[s'] action[s]." *Int'l Bus. Machs. Corp.*, 363 F.3d at 148 (IBM 2) (internal quotation marks omitted) (emphasis added); *cf. CGS Indus., Inc.*, 720 F.3d at 83 ("[W]here several claims arise from the same set of facts, if any of the claims are covered by the policy, the insurer consequently has a duty to defend the entire action brought under any of the ... policies." (internal quotation marks omitted)).

In sum, Liberty asks this Court to terminate its duty to defend on the basis of evidence relevant to the underlying actions – evidence that the Authority itself produced in those actions as part of its defense. New York law does not permit termination under such circumstances. *Cf. Int'l Bus. Machs. Corp.*, 303 F.3d at 426-27 (IBM 1) ("We doubt that New York courts would reward Liberty Mutual by considering extrinsic evidence flushed out as a result of its unwillingness to take a position regarding the [underlying] claim for over three years."). If Liberty seeks to terminate its duty, it may assist the Plaintiffs, and the Authority, in making the precise arguments the Authority has been making, and if successful, Liberty may seek declarations from the underlying courts that its duty is at end. It may not, however, terminate its duty to defend in this proceeding.

The Court thus grants summary judgment to the Plaintiffs as to all of its claims on this independent ground, and denies the Defendant's cross-motion for the same reason.

## C.    The Plaintiffs' Motion for Costs and Fees

Finally, the Plaintiffs argue that they are entitled to costs and fees spent in the underlying defense. *See* Pl. Mem. at 24-25. The Court agrees, for the above reasons, that Plaintiffs are entitled to damages for Liberty's breach of its duty to defend. Plaintiffs also ask, however, that this Court hold that specific rates of compensation for the Plaintiffs' attorneys are reasonable, notwithstanding the fact that they have not yet submitted papers seeking to establish the precise amount of damages to which they are entitled. *Id.* The Court declines to determine what is a reasonable rate at this time. Instead, within one week of this order, the parties are ordered to propose a briefing schedule to determine the amount of damages owed to Plaintiffs as a result of Liberty's breach of its duty to defend. The Court will resolve all damages issues, including the relevant lodestar for the Plaintiffs' attorneys, in resolving the issues raised in that briefing.

## IV.     Conclusion

In conclusion, the Court grants the Plaintiffs' motion for partial summary judgment in its entirety, denies the Defendant's cross-motion in its entirety, but reserves on the question of the precise amount of reimbursement and damages owed for Liberty's breach. This resolves docket numbers 29 and 34. Within one week of the date of this order, the parties shall propose a briefing schedule to determine the amount of damages owed to Plaintiffs.


SO ORDERED.


Dated: September 28, 2017
       New York, New York



_____
ALISON J. NATHAN
United States District Judge